IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CRAIG EGLER, | ) | Case No. 1:18-cv-0461 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| v. | ) | |
| | ) | |
| COMMISSIONER OF | ) | **MEMORANDUM OF OPINION AND** |
| SOCIAL SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

**I.     Introduction**

Plaintiff, Craig Egler, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income benefits under Title XVI of the Social Security Act ("Act").  The parties consented to my jurisdiction.  ECF Doc. 11. Because substantial evidence supported the ALJ's decision and because the only incorrect application of legal standard identified by Egler resulted in harmless error, the final decision of the Commissioner must be AFFIRMED.

**II.    Procedural History**

Egler applied for SSI on September 15, 2014, alleging a disability onset date of March 1, 1999.[1]  (Tr. 145-150).  After his application was denied initially on January 12, 2015 (Tr. 91-93) and on reconsideration on August 18, 2015 (Tr. 96-97), Egler requested an administrative hearing.  (Tr. 98).  Administrative Law Judge ("ALJ") Pamela Loesel heard the case on January

---

[1] Egler amended his onset date to January 13, 2014 at the administrative hearing.  (Tr. 34).

11, 2017 (Tr. 30-59) and denied Egler's claim on April 24, 2017. (Tr. 15-25). On December 29, 2017, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4). Egler filed this action on February 27, 2018 challenging the Commissioner's final decision. ECF Doc. 1.

## III. Evidence

### A. Relevant Medical Evidence

On July 9, 2014, Egler met with LISW, Megan Ray-Novak, of the Care Alliance Health Care ("CAHC") for counseling. (Tr. 236-239). He was not receiving any other treatment at the time. (Tr. 238). Egler presented with dysthymia, anhedonia, blunted affect, sleep disturbance, transient lifestyle, difficulty trusting others, mood swings, anxiety, being angry toward those around him and projecting his anger toward the community, ongoing flashbacks, and reliving the moment when he was kidnapped at age 12. (Tr. 237). He had trouble concentrating and remembering and reported hearing the voice of his childhood attacker. (Tr. 237). His mental status examination revealed motor activity retardation, constricted speech, blunted affect, guarded demeanor, depressed mood and his behavior was cooperative but guarded. He was diagnosed with posttraumatic stress disorder and major depressive disorder, moderate. Ms. Novak assigned a GAF of 30. She recommended weekly to bi-weekly counseling sessions. (Tr. 239).

Egler saw Christina Stehouwer, P.A., on August 13, 2014 for a physical examination. He complained of insomnia and feeling depressed and anxious at times. Ms. Stehouwer noted a cooperative demeanor and that Egler was not in apparent distress. She prescribed Paxil for PTSD symptoms, Paroxetine for depression and Trazadone for sleep. (Tr. 233-235).

2

On August 20, 2014, Egler reported improvement in his mood and sleep pattern. Ms. Novak observed improved problem-solving and ability to utilize appropriate support systems. She also observed a cooperative demeanor. Egler said that he was working odd jobs landscaping and as a handyman. (Tr. 232-233). On September 24, 2014, Egler reported to Ms. Stehouwer that his sleep was improved with Trazodone and that counseling was helping. (Tr. 231).

Egler initiated mental health treatment with Frontline in January 2015. (Tr. 353). During a diagnostic assessment on March 12, 2015, Egler reported that he was homeless but was in the process of finding housing. (Tr. 305). The evaluating clinician diagnosed PTSD and recommended medication services, counseling, and case management services. (Tr. 310).

On March 25, 2015, Egler reported that his medication was working. His symptoms and his sleep were improving. (Tr. 273).

Egler saw treating psychiatric nurse practitioner Maureen Sweeney on April 15, 2015. Egler reported that he needed to get "back on [his] meds." He had been off his medications for a month and had experienced increased depression and flashbacks. (Tr. 289). Ms. Sweeney noted that Egler's grooming was fair; he had normal motor activity; normal speech; average demeanor; full affect; average intelligence; organized thought process; partial insight; mildly impaired judgment; and cooperative behavior.[2] (Tr. 287-288). Ms. Sweeney restarted Paxil and Trazadone but requested to see Egler once a month for continued refills. (Tr. 289).

At an appointment on June 3, 2015, Ms. Sweeney made similar observations. Egler stated that his mood and sleep were "okay." He was only sleeping three to four hours per night; his biggest barriers to sleeping were nightmares and sleeping outside. Ms. Sweeney added Prazosin to treat the nightmares. (Tr. 292).

---

[2] Ms. Sweeney made similar observations at subsequent appointments with Egler. (Tr. 293-294, 296-297, 299-300, etc.).

In July 2015, Egler reported continued depression due to his lack of housing; he was still living in an abandoned house. Ms. Sweeney opined that Egler had been staying away from society as a coping mechanism, but it had also prolonged his trauma symptoms. Egler stated that his medications were helping with his mood, despite his housing situation. (Tr. 295). Later that month, Egler reported that Prazosin was "starting to work" and his sleep was improving, but he was still having nightmares. Egler still lived in abandoned houses. (Tr. 298).

In September 2015, Egler reported to Ms. Sweeney that his sleep issues had mostly resolved since finding housing. (Tr. 300). Egler reported that his mood was good; he seemed more open; and his affect was brighter than at previous appointments. (Tr. 301)

Egler presented to his therapist on October 20, 2015 in a catatonic state and struggled to verbalize his needs and status. (Tr. 329). Egler stated that he had been staying in abandoned buildings. He denied alcohol or drug use, but his therapist noted that his presentation "may indicate otherwise." (Tr. 330).

In November 2015, Egler had not taken his medication for two weeks. He met with Ms. Sweeney to get back on his medications. (Tr. 303-304). Egler had started living in abandoned properties again despite having an apartment. Ms. Sweeney noted an increase in depression and anxiety symptoms. (Tr. 304). Later that month, Egler acknowledged doing much better after restarting his medications. He was sleeping in his apartment again. (Tr. 333).

At his counseling session with Cathy Alexander on December 4, 2015, Egler was doing much better since restarting his anti-psychotic medication. He was living in his apartment and was not having thoughts of needing to flee. Ms. Alexander noted marked improvement with the reinstatement of Egler's medication. (Tr. 363).

Egler did not return to Frontline again until February 11, 2016. He returned to see Ms. Sweeney stating that, "I just need my meds back." He reported increased nightmares, hypervigilance, and depressed mood. (Tr. 376). On March 10, 2016, Egler reported that things were getting a little better. He continued to be withdrawn but overall was much brighter than at his most recent appointment. Ms. Sweeney noted increased functionality as evidenced by his socializing with his friends in his apartment. (Tr. 373).

On April 8, 2016, Egler reported being "alright better on meds." Ms. Sweeney noted that he was continuing to have severe difficulty with socialization, but his mood had improved and his nightmares had decreased on medication. (Tr. 370). In May 2016, Ms. Sweeney noted a constricted affect and that Egler generally liked to keep the length of his visits short. However, he reported that his symptoms were well-controlled with medications. He reported that his sleep was good and his nightmares were almost completely resolved. Ms. Sweeney stated that Egler's baseline was "difficult to engage;" he improved during periods of medication compliance. (Tr. 396). In June 2016, Egler reported doing "the same." Ms. Sweeney noted that Egler had been stable and was not taking any antipsychotics. This led her to believe that his mental impairments were related to trauma. (Tr. 399).

In November 2016, Egler reported to Ms. Sweeney that he had been doing well despite being off all his medications since August 2016. However, he was having nightmares almost every night. He also reported flashbacks and/or auditory hallucinations. Ms. Sweeney restarted Egler's medications. (Tr. 406).

**B.     Opinion Evidence**

**1.     Consultative Exam – Dr. Herschel Pickholtz – January 23, 2006**

Egler met with Dr. Herschel Pickholtz for a consultative examination on January 23, 2006.  Egler reported that he had previously received disability benefits for six months in1999 before going to prison. (Tr. 204).  Egler told Dr. Pickholtz that he stopped working because of shortness of breath, not because of psychiatric complaints. (Tr. 208)  Egler reported that, when he was very young, he was kidnapped and raped by a male.  Medications were helping him sleep but he reported bad dreams. (Tr. 204).  Pickholtz's report also notes flashbacks to Egler's abuse.

Dr. Pickholtz observed that Egler's verbalizations fell within the upper end to borderline range of mild mental retardation, which was inconsistent with some of his test performances.  He noted that Egler put forth very little effort across testing.  He opined that his test scores were an underestimate of his level of functioning.  He reported that Egler was a bit constricted and depressed. (Tr. 206).  Egler's ability to recall five objects after 20 minutes was within the borderline range.  His intellectual functioning fell within the upper end of mild mentally retarded and was inconsistent with some of his verbalization suggesting that he was within at least borderline levels of intellectual performance.  Intelligence testing showed a full scale IQ of 66, verbal IQ of 67 and performance IQ of 70, but Dr. Pickholtz opined that the true functioning fell between 70 and 80. (Tr. 207).

Dr. Pickholtz diagnosed mixed polysubstance abuse or dependency allegedly in full remission as of a year earlier; post-traumatic stress disorder, mild with current medications; depressive disorder, mild with current medications; mixed personality involving addictive, oppositional features with some tendencies toward exaggeration; and borderline levels of

intellectual functioning. Dr. Pickholtz assessed a Global Assessment of Functioning ("GAF") rating of 65. (Tr. 209).

## 2. Consultative Exams by Dr. David House – 2011 & 2014

On December 21, 2011, Egler met with David House, Ph.D. (Tr. 214-220). Egler had not taken psychotropic medications for seven to eight months. (Tr. 215). He reported having no friends and no involvement with the community or attending church. (Tr. 214). He was kicked out of school for behavioral problems and his grades were below average. (Tr. 214). He presented "jitteriness," with pressured speech, poor memory and poor judgment. He reported a poor energy level, a history of impulsivity, legal difficulties, trouble sleeping, panic attacks, mood swings, and socially isolating behavior. (Tr. 215-216). He reported hearing voices. (Tr. 217). Egler could not do serial 7's subtraction of serial 3's. (Tr. 217). His pace was a bit rapid, his persistence was poor, he had difficulty completing tasks, and he had poor remote memory. (Tr. 217). After five minutes, he was unable to recall three objects. (Tr. 218). Dr. House diagnosed posttraumatic stress disorder, obsessive compulsive disorder, psychotic disorder in reported remission, and polysubstance abuse in reported remission. (Tr. 218). Dr. House opined that Egler demonstrated some memory deficits in both long and short-term memory; demonstrated significant difficulties in concentration and attention; would have difficulty with social interaction; and was likely to decompensate under stress and be disruptive and dysfunctional in a work environment. (Tr. 219). Dr. House assessed a GAF rating of 41. (Tr. 220).

Egler saw Dr. House again on March 7, 2014 for the current disability claim. (Tr. 221-229). Egler reported he had not taken any psychotropic medications since 2010 or 2011. (Tr. 223). Most of Egler's background information remained the same. Egler reported sleeping

7

problems and nightmares. He woke up in sweats, had decreased appetite and episodes of crying. (Tr. 224). Egler had frequent panic attacks, hoarder traits, mood swings, avoided other people (especially females), and had "some unusual thought process." Dr. House also noted impaired memory but that loose associations and tangentiality were not evident. (Tr. 224-227). Egler reported hearing voices and saw shadows with intense auditory flashbacks. Dr. House observed that Egler's pace was choppy, his persistence was inconsistent, he had difficulty completing tasks and he could not do serial 7's or 3's. (Tr. 226). Egler showed a consistent pattern of mood disturbance along with trauma and some dissociative issues. (Tr. 228). Dr. House opined that Egler's ability to carry out instructions seemed problematic; he had a major concentration impairment; he would have significant difficulties getting along with supervisors and coworkers; and he would be dysfunctional and disruptive in a work environment. (Tr. 228). Dr. House diagnosed mood disorder, posttraumatic stress disorder, cannabis abuse, in reported remission, obsessive compulsive disorder; and borderline intellectual functioning. He opined that Egler's prognosis was poor. (Tr. 229).

### 3. Consultative Exam – Dr. Michael Faust – December 5, 2014

Egler underwent a consultative examination by Dr. Michael Faust on December 5, 2014. (Tr. 247-254). Egler told Dr. Faust that this was his sixth disability application and that his previous applications had been denied. Egler stated that he was disabled due to his mood swings, anxiety and depression. (Tr. 247). He reported being homeless for 15 years and staying in abandoned houses. He had not had consistent work as an adult and had problems at work because of tardiness. (Tr. 248). Egler reported depressed mood, crying spells, variable appetite, poor sleep, nightmares, decreased energy level, decreased motivation, decreased interest and feelings of hopelessness and helplessness and that he couldn't trust people. He denied delusional

8

thinking, paranoid ideations, or auditory or visual hallucinations. He was currently taking Paxil and Trazadone. (Tr. 249). He also reported nightmares and flashbacks, that he was easily startled, hypervigilant, and anxious around people. (Tr. 249). Egler had a poor appearance and was wearing soiled clothing. (Tr. 250). He had variable attention and lost his train of thought on mental status tasks. His affect was blunted; his mood was depressed and angry; and he appeared fatigued and reported difficulty sleeping. (Tr. 251). He completed serial 7's up to the 6th number very slowly. He was able to recall two or three words after five minutes. (Tr. 251).

Dr. Faust diagnosed posttraumatic stress disorder; major depressive disorder, recurrent, moderate; panic disorder; alcohol use disorder in full sustained remission; cannabis use disorder in full sustained remission. (Tr. 252). Dr. Faust noted logical and linear thinking, intact memory, and that Egler had no difficulty tracking the conversation. (Tr. 250, 253). He estimated that Egler's intelligence was in the average range. (Tr. 252). Egler did not demonstrate difficulty understanding verbal instructions. But Dr. Faust opined that Egler may have some trouble remembering and carrying out tasks to completion due to observed lapses in sustained attention; that he would be limited in attention and concentration; that he would be limited in responding appropriately to supervision or to coworkers in an employment setting; and that he would be limited in responding appropriately to work pressures. (Tr. 254).

### 4. Consultative Exam – Jorethia Chuck, Ph.D. – July 2015

Dr. Jorethia Chuck evaluated Egler on July 24, 2015. (Tr. 281-286). Egler stated that he suffered from depression, anxiety and PTSD. (Tr. 281). He reported that he had been homeless for fifteen years but had moved into subsidized housing the week before his evaluation. He reported that he had problems in the community with "people making fun of him." He reported a history of incarceration, and drug and alcohol abuse. (Tr. 282). He had been clean and sober for

9

eight to nine years. (Tr. 283). He reported flashbacks and nightmares regarding his kidnapping incident. (Tr. 283). He stated that he sometimes felt like hurting himself and others. He also felt like hurting the man who had kidnapped him. He had difficulty falling and staying asleep. He reported depressive symptoms including: dysphoric mood, trouble concentrating, loss of interest, diminished sense of pleasure, crying spells, irritability, and social withdrawal. (Tr. 283)

Dr. Chuck noted that Egler's affect was anxious and tense, his mood was sad and lethargic, and he reported that he always felt depressed. Egler could not do serial 3's but he could remember three objects immediately and two after five minutes and recite four digits forward and two digits backwards. Dr. Chuck estimated his cognitive functioning was in the low average range. (Tr. 284). Dr. Chuck diagnosed major depressive disorder, single episode, moderate; posttraumatic stress disorder; and generalized anxiety disorder. She opined that his prognosis was guarded. Egler reported that his depressive and anxiety symptoms were increasing and appeared to be limiting his functioning. Dr. Chuck opined that Egler had some difficulty with his concentration but was able to perform multi-step tasks and was able to get along with coworkers and supervisors. She also noted that his difficulty with sleep and nightmares may affect his ability to respond appropriately to work pressures in a work setting. (Tr. 285-286).

### 5. State Agency Reviewing Physicians

Paul Tangeman, Ph.D., reviewed Egler's records on January 6, 2015 and opined that Egler was moderately limited in his ability to perform activities of daily living and maintain social functioning, and mildly limited in his ability to maintain concentration, persistence or pace. (Tr. 65). Dr. Tangeman opined that Egler was capable of performing, concentrating on, and persisting at one to three step simple tasks in environments that wouldn't require a

10

consistently rapid pace. Dr. Tangeman opined that Egler was capable of brief and superficial interactions with the general public, supervisors and co-workers and would do best in worksites in which he could work relatively independently and without close, over-the-shoulder supervision. (Tr. 68). Finally, Dr. Tangeman opined that Egler was capable of handling a work environment with infrequent change and that would not require a high level of mental demand. (Tr. 69).

Kristen Haskins, Psy.D., reviewed Egler's records on August 18, 2015. (Tr. 82-86). She opined that Egler was moderately limited in his ability to perform activities of daily living, maintain social functioning, maintain concentration, persistence, or pace. (Tr. 82). She opined that Egler could: understand, remember and carry out simple, routine, one to two, and some three to four, step tasks; attend, concentrate, and persist in settings with short cycle tasks and, at most, moderate pace demand; and interact appropriately with peers and supervisors during occasional, superficial interactions. (Tr. 84-85). Dr. Haskins opined that Egler should not work with the public. She noted the progress he was making with his medication and treatment regimen. She also opined that the assessment of psychological consultative examiner, Dr. House, was an overestimate of the severity of Egler's limitations. (Tr. 86). She assigned great weight to the limitations expressed by Dr. Chuck. (Tr. 84).

    **C.**    **Relevant Testimonial Evidence**

        **1.**    **Egler's Testimony**

Egler testified at the administrative hearing on January 11, 2017. Egler was living in an apartment by himself. His daughter came to help him three or four times a month. His daughter did his laundry and brought groceries. Egler was able to prepare his own meals, bathe and dress himself and clean. Egler did not drive; he used a bus pass. (Tr. 38-39).

Egler did not have any friends. He enjoyed music and watching T.V. He did not belong to any clubs, organizations or church groups. (Tr. 40). He did not do any shopping. (Tr. 41)

Egler did not graduate from high school; he dropped out in ninth grade. He was unsuccessful in obtaining a GED. (Tr. 43). Egler's only work history was a seasonal job working for the Salvation Army ringing a bell. He also worked for a short time at a restaurant doing clean up. (Tr. 42-43). Egler did not think he would be able to work due to his medications, which caused him to feel sleepy or to "not move fast enough." (Tr. 50).

Egler was taking medications for his mental impairments. The medications helped him. He was getting three to four hours of sleep per day. He was still having auditory hallucinations. At first, the medication helped with those, but they had returned. (Tr. 45).

Egler was around 12 years old when the kidnapping incident occurred. He did not receive psychiatric care at that time. (Tr. 49). Egler continued to have flashbacks and auditory hallucinations, but his medication helped him. (Tr. 52).

Egler had asthma and Hepatitis B. He was taking medications for both of those conditions. (Tr. 53-54).

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Gail Klier also testified at the administrative hearing. (Tr. 53-58). Egler did not have any past relevant work history. (Tr. 55). The VE testified that an individual of the same age, education and past work as Egler, who could perform a full range of exertional work; could perform simple, routine tasks consistent with unskilled work with no fast pace or high production quotas; with superficial interaction (meaning of short duration for a specific purpose) with both coworkers and supervisors, but no direct work with the general public; and could perform work with infrequent change, could perform the jobs of cleaner II,

cook helper, and dishwasher. There were a significant number of these jobs in the national economy. (Tr. 55-56). The individual would still be able to perform these jobs if he were limited to low stress work – meaning no arbitration, negotiation, responsibility for the safety of others, and/or supervisory responsibility. However, he would not be able to perform those jobs, or any other jobs, if he were off task twenty percent of the time due to mental health symptoms; required extra breaks beyond those ordinarily provided; and/or missed more than two days per month. (Tr. 56-58). The listed jobs would also be eliminated if the individual could not have any contact with coworkers and only ten percent contact with supervisors. (Tr. 57).

## IV. The ALJ's Decision

The ALJ's April 24, 2017 decision contained the following findings relevant to this appeal:

> 4. Egler had the residual functional capacity to perform a full range of work at all exertional levels but he could perform only simple, routine tasks (consistent with unskilled work), with no fast-pace or high-production quotas. He could perform work with superficial interaction (meaning of short duration for a specific purpose) with co-workers and supervisors. He could not perform direct work for the general public (i.e. customer-service type work). He could perform work with infrequent changes and low-stress work (meaning no arbitration, negotiation, responsibility for the safety of others or supervisory responsibility.) (Tr. 20).
>
> 9. Considering Egler's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform. (Tr. 24).

Based on all her findings, the ALJ determined that Egler had not been under a disability since September 15, 2014, the date his application was filed. (Tr. 25).

13

## V. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence means "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

The court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir. 1997). If supported by substantial evidence and decided under the correct legal standard, the Commissioner's decision must be affirmed even if this Court would decide the matter differently, and even if substantial evidence also supports the claimant's position. *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc.)

The court also must determine whether the ALJ decided the case using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do

not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering an application for supplemental security income or for disability benefits, the Social Security Administration is guided by the following sequential benefits analysis: at Step One, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step Two, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step Three, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step Four, the Commissioner determines whether or not the claimant can still perform his past relevant work; and finally, at Step Five, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. §404.1512(a).

### B. Residual Functional Capacity

Egler argues that the ALJ's RFC assessment was not supported by substantial evidence. Specifically, he argues that the ALJ erred by not incorporating limitations in Egler's RFC consistent with the consultative reports of Dr. House.

An ALJ's RFC determination is proper when it is based upon "all of the relevant medical and other evidence." 20 C.F.R. § 416.945 (a)(3). At its most basic level, a claimant's RFC is simply an indication of his work-related abilities despite his limitations. *See* 20 C.F.R. § 404.1545(a)(1). The RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(2). Accordingly, the ALJ bears the responsibility for determining a claimant's RFC based on all the relevant evidence. *See* 20 C.F.R. § 404.1545(a)(3).

Under 42 U.S.C. § 405(g), the findings of the ALJ are conclusive if they are supported by substantial evidence. Here, the ALJ incorporated several limitations into her RFC determination. Egler argues that "substantial evidence supports far greater restrictions and limitations." ECF Doc. 13 at Page ID# 468. But, Egler does not list what those limitations should have been.

Egler complains that the ALJ's RFC determination was inconsistent with the reports of Dr. House. The ALJ afforded some weight to Dr. House's opinions, stating:

> It is unclear as to whether Dr. House opined that the claimant's limitations would be during periods of medication or non-medication. These opinions and reports are inconsistent with other evidence in the medical record as to the claimant's functioning, including opinions of Dr. Sioson, Dr. Pickholtz, and Dr. Faust.

(Tr. 23). The ALJ's reasoning for assigning only "some" weight to Dr. House is supported by other medical opinions and treatment notes. The evidence, including Egler's testimony at the

16

administrative hearing, shows that Egler's mental health symptoms improved when he was taking his prescribed medications. (Tr. 45).

Egler argues that Dr. House's 2014 opinion was consistent with his 2011 opinion and with the opinion of Dr. Faust. Egler also cites medical records in which Egler reported hearing voices and having flashbacks, not feeling comfortable around people, having problems with concentration, and living in abandoned property even though he had his own apartment. ECF Doc. 13 at Page ID# 470. But, even if these arguments have merit, the ALJ was not required to assign controlling weight to Dr. House's opinions or even to provide good reasons for failing to do so. *See Rudd v. Comm'r of Soc. Sec.,* 531 F. App'x 719, 730 (6th Cir. 2013), *citing Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994). Egler cites no authority to the contrary. There were five consultative examination reports in Egler's records. Dr. House's reports were not the most recent and they were based on Dr. House's observations of Egler when he was off his medications. The ALJ also pointed out that Dr. House's opinions were inconsistent with other evidence in the record including the opinions of Drs. Sioson, Pickholtz and Faust. Moreover, as the court noted above, Dr. Kristen Haskins opined that Dr. House's opinions were an overestimate of Egler's limitations. *Supra*, p. 11, Tr. 86.[3] In sum, the ALJ explained the weight assigned to Dr. House's opinions and the reasons for that weight. She satisfied the legal standards applicable to an examining physician. *See* 20 CFR § 404.1527(c).

Egler contends that he has greater limitations than those reflected in the RFC in the following areas:

---

[3] Because Dr. House was not a treating source, the ALJ was not required to list this specific conflicting opinion; however, the ALJ stated that she had given "careful consideration of the entire record," so the court infers the ALJ was aware of this additional conflicting evidence further justifying the amount of weight given to Dr. House's opinions. (Tr. 20).

1) **being off task and completing tasks** – but, the ALJ's RFC determination included a limitation that Egler could not perform any fast-pace or high production quotas;

2) **having problems with concentration** – but the ALJ's RFC determination included a limitation to simple, routine tasks with infrequent changes; and

3) **dealing with others** – but the ALJ's RFC determination included a limitation to superficial interaction with co-workers and supervisors and no direct work with the general public. It also included a limitation to low-stress work with no arbitration, negotiation, or responsibility for the safety of others or supervisory responsibility.

ECF Doc. 13 at Page ID# 470; (Tr. 20). Thus, the ALJ's RFC determination includes limitations for each of these areas identified by Egler. As noted above, Egler never indicated what additional limitations the ALJ should have incorporated into his RFC.

As discussed above, the Commissioner's findings cannot be reversed merely because there exists in the record substantial evidence to support a different conclusion. *See Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1999); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). The question in this case is not whether there is evidence to support two different conclusions; instead, the question is whether there is evidence to support the ALJ's RFC finding. The ALJ was not required to base her RFC determination on the evidence identified by Egler. There were several reports from examining physicians in Egler's record. The ALJ considered *all* of the medical evidence in the record and cited substantial evidence supporting her RFC determination. Because substantial evidence supported the ALJ's RFC determination, it must be AFFIRMED.

### C. Consultative Examiner, Dr. Chuck

Egler also argues that the ALJ's decision lacks substantial evidence because her decision failed to include any evaluation of the opinions of Dr. Jorethia Chuck. ECF Doc. 13 at Page ID# 470. The Commissioner concedes that the ALJ did not discuss Dr. Chuck's opinion but argues that the error was harmless. ECF Doc. 15 at Page ID# 494. The Commissioner cites *Wilson v.*

*Comm'r of Soc. Sec.,* 378 F.3d 541, 547 (6th Cir. 2004), in which the Sixth Circuit identified examples of circumstances in which failing to address a treating source's opinion "may not warrant reversal:" (1) "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of § [416.927](d)(2) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation." The Commissioner argues that the *Wilson* exceptions would certainly apply to an examining physician, whose opinion is afforded less deference under the regulations in effect on the date of the ALJ's decision. 20 C.F.R. § 416.927(c)(2). The Commissioner contends that the second and third exceptions identified in *Wilson* apply here because the ALJ's RFC determination was consistent with the opinions expressed by Dr. Chuck. ECF Doc. 15 at Page ID# 495-496.

Here, there were at least seven opinion reports from physicians in Egler's record – five from examining physicians and two from state-agency reviewing physicians. The ALJ discussed all these opinions except Dr. Chuck's. Her failure to mention Dr. Chuck's opinion in her decision was error. However, the court concurs with the Commissioner the error was harmless. Egler doesn't point to any specific opinion expressed by Dr. Chuck that, had it been accepted, would have altered the ALJ's decision.

In fact, it appears that the ALJ's decision was consistent with Dr. Chuck's opinion. Dr. Chuck noted that Egler did not report any problems with concentration, understanding or remembering instructions in a work setting. (Tr. 285). She opined that he appeared capable of performing multi-step tasks; that he got along with co-workers and supervisors and appeared to present with social conformity during the interview; and that he was displaying or trying to

19

display self-regulation. (Tr. 286). Dr. Chuck did not opine that Egler was unable to work. The ALJ's decision appears to be consistent with Dr. Chuck's opinion. Arguably, the ALJ effectively gave great weight to Dr. Chuck's opinion when she assigned great weight to the opinion of Dr. Haskins, who reviewed Egler's records and found that Dr. Chuck's opinion was entitled to great weight because it was consistent with the totality of the evidence. (Tr. 22, 84).

ALJ Loesel should have addressed Dr. Chuck's opinion in her decision. But remanding the case on that basis would not alter the ALJ's decision because her RFC findings were consistent with the opinions expressed by Dr. Chuck. *See Dutkiewicz v. Comm'r of Soc. Sec.*, 663 F. App'x. 430, 432 (6th Cir. 2016); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440-41 (6th Cir. 2010). Here, the ALJ made findings consistent with Dr. Chuck's opinion and met the goal of § 404.1527(c)(1). Her failure to address the opinions expressed by Dr. Chuck was harmless error. The court will not remand the ALJ's decision on this basis.

## VI. Conclusion

Because substantial evidence supported the ALJ's decision and because the only incorrect application of legal standard identified by Egler resulted in harmless error, the ALJ's final decision is AFFIRMED.

IT IS SO ORDERED.

Dated: December 28, 2018

Thomas M. Parker
United States Magistrate Judge